# UNITED STATES DISTRICT COURT

for the

Eastern District of California

<table>
<tr><td>

FILED

**Oct 25, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
</td></tr>
</table>

In the Matter of the Search of )
)
INFORMATION ASSOCIATED WITH )
TLECLAIR101@GMAIL.COM THAT IS )
STORED AT PREMISES CONTROLLED BY )
MICROSOFT CORPORATION )
)

Case No.   2:22-sw-0770 EFB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

## SEE ATTACHMENT A, attached hereto and incorporated by reference.

located in the ____Western____ District of ____Washington____ , there is now concealed *(identify the person or describe the property to be seized):*

## SEE ATTACHMENT B, attached hereto and incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251 | Sexual Exploitation of Minor(s) |
| 18 U.S.C. §§ 2423(c) | Engaging in Illicit Sexual Conduct in a Foreign Place |

The application is based on these facts:

## SEE AFFIDAVIT, attached hereto and incorporated by reference.

☒ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Scott Schofield

*Applicant's signature*

Special Agent Scott A. H. Schofield, FBI

*Printed name and title*

Sworn to before me and signed pursuant to Rule 4.1.

Date: ____10/25/22____

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

City and state: ____Sacramento, California____

1  PHILLIP A. TALBERT
   United States Attorney
2  CHRISTINA McCALL
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile:  (916) 554-2900
5

6  Attorneys for Plaintiff
   United States of America
7

8                  IN THE UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10

11  In the Matter of the Search of:            CASE NO.

12  INFORMATION ASSOCIATED WITH               AFFIDAVIT IN SUPPORT OF AN APPLICATION
    MICROSOFT ACCOUNT(S):                     FOR A SEARCH WARRANT
13  TLECLAIR101@GMAIL.COM THAT ARE
    STORED AT PREMISES CONTROLLED BY          ~~FILED UNDER SEAL~~
14  MICROSOFT CORPORATION

15

16         I, Scott A. H. Schofield, being first duly sworn, hereby depose and state as follows:

17                I.        **INTRODUCTION AND AGENT BACKGROUND**

18         1.       I make this affidavit in support of an application for a search warrant for information

19  associated with certain accounts that are stored at premises controlled by MICROSOFT

20  CORPORATION, a technology company headquartered at 1 Microsoft Way, Redmond, Washington

21  98052.  The information to be searched is described in the following paragraphs and in Attachment A,

22  hereby incorporated by reference.  This affidavit is made in support of an application for a search

23  warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require MICROSOFT

24  CORPORATION to disclose to the government copies of the information (including the content of

25  communications) further described in Section I of Attachment B.  Upon receipt of the information

26  described in Section I of Attachment B (hereby incorporated by reference), government-authorized

27  persons will review that information to locate the items described in Section II of Attachment B.

28         2.       I am a Special Agent with the Federal Bureau of Investigation, and have been since 2004.

I am currently assigned to the Violent Crimes Against Children Squad in the Sacramento Division. While employed by the FBI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography.  I have received training in the area of identifying and investigating child pornography and child exploitation crimes, and as part of my duties have observed and reviewed countless examples of child pornography in all forms of media, including computer media.  I have served temporary duty assignments in both the Philippines and Cambodia during which I assisted in numerous investigations of American citizens who traveled to these countries for the purpose of having sex with minors.  In the course of my employment, I have participated in many search warrants in connection with child exploitation matters and other violations involving both physical locations like businesses and residences and online accounts.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251, 2252, 2423(b), (c), (f) and 2422(b), and I am authorized by the Attorney General to request a search warrant.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from others.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and, therefore, does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 2251(a), (c), and (e), relating to the production of material involving the sexual exploitation of minor(s) in the United States and in foreign places, and Title 18 U.S.C. §2423(c), relating to engaging in illicit sexual conduct with a minor in foreign places, have been committed by the user(s) of the MICROSOFT account listed in Attachment A (hereinafter referred to as the "SUBJECT ACCOUNT").  I submit that there is probable cause to search the SUBJECT ACCOUNT for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## II.     JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a[] district court of the United States . . . that – [] has jurisdiction

1  over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

2  ### III.  BACKGROUND CONCERNING MICROSOFT

3      6.    This section contains my understanding of some of Microsoft Corporation's available

4  services.  I know, based on my training and experience, that MICROSOFT is a provider of various

5  online services, including the following: an Internet search engine (called Bing), email accounts (which

6  generally end in @outlook.com or @hotmail.com, but can end in other domains), cloud/network storage

7  services (OneDrive), internet browsers (MICROSOFT Edge and Internet Explorer), word processing,

8  spreadsheet, and other office functions (MICROSOFT 365), online note-taking software (OneNote),

9  online mapping software (Bing Maps), and various other media applications.  Outlook and Hotmail are

10  commonly used to email images and attachments, and the OneDrive cloud storage application is also

11  commonly used to store images, videos, and documents.  I know that in order to access and use the

12  majority of the MICROSOFT services described above, the creation of a MICROSOFT account is

13  required.  Upon the creation of an account, the user/creator would then have access to all of these extra

14  services and can use them at will.

15      7.    I also know from training and experience that the MICROSOFT operating system called

16  Windows is the predominant operating system used on computers and that many versions of this

17  software require the user to log in to the computer using their MICROSOFT account.  In addition,

18  logging in in this way can cause information from the device to be stored or backed up to the online

19  MICROSOFT account.  This can include internet browsing history and internet search engine searches.

20      8.    I know that files stored in a user's OneDrive account can be shared when a user

21  designates files to be shared and the system generates a web link that is sent to another user.  This link

22  gives the second user access to those particular files.

23      9.    In my training and experience, MICROSOFT generally asks subscribers to provide

24  certain personal identifying information when registering for an account.  Such information can include

25  the subscriber's full name, physical address, telephone numbers and other identifiers, email addresses,

26  and other personal information.  In my training and experience, such information may constitute

27  evidence of the crimes under investigation because the information can be used to identify the account's

28  user or users.  Based on my training and experience, I know that even if subscribers insert false

1  information to conceal their identity, this information can provide clues to their identity, location or
2  illicit activities.

3       10.    In my training and experience, social network and email providers typically retain certain
4  transactional information about the creation and use of each account on their systems.  This information
5  can include the date on which the account was created, the length of service, records of log-in (i.e.,
6  session) times and durations, the types of services utilized, the status of the account (including whether
7  the account is inactive or closed), the methods used to connect to the account (such as logging into the
8  account via the provider's website), and other log files that reflect usage of the account.  In addition,
9  social network and email providers often have records of the Internet Protocol address ("IP address")
10 used to register the account and the IP addresses associated with particular logins to the account.
11 Because every device that connects to the Internet must use an IP address, IP address information can
12 help to identify which computers or other devices were used to access the account.

13      11.    As explained herein, information stored in connection with a social media or email
14 account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal
15 conduct under investigation, thus enabling the United States to establish and prove each element or
16 alternatively, to exclude the innocent from further suspicion.  In my training and experience, the
17 information stored in connection with a MICROSOFT account can indicate who has used or controlled
18 the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy"
19 while executing a search warrant at a residence.  For example, email communications, "friend" lists,
20 chat communications, and images sent (and the data associated with the foregoing, such as date and
21 time) may indicate who used or controlled the account at a relevant time.  Further, information
22 maintained by the provider can show how and when the account was accessed or used.  For example, as
23 described below, email providers typically log the Internet Protocol (IP) addresses from which users
24 access the account along with the time and date.  By determining the physical location associated with
25 the logged IP addresses, investigators can understand the chronological and geographic context of the
26 email account access and use relating to the crime under investigation.  This geographic and timeline
27 information may tend to either inculpate or exculpate the account owner.  Additionally, information
28 stored in the user's account may further indicate the geographic location of the account user at a

particular time (e.g., location information integrated into an image or video sent via email).  Lastly, stored electronic data may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation.  For example, information in the account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## IV.   **PROBABLE CAUSE**

14.     In June 2022, a man with initials MQ contacted the FBI National Threat Operations Center to report that a man named TERRY LE CLAIR (hereinafter "LE CLAIR") had inappropriately touched MQ while on a trip to Europe in 2017 and took pictures of this touching, as well as of MQ's genitalia.  MQ was 15 years of age at the time of the trip.

### *INTERVIEW OF MQ*

12.     I interviewed MQ in late June 2022 and he told me the following, in part:

a)      When MQ was approximately 12 years of age, his sister became interested in dog agility training.  Their mother took them to the residence of LE CLAIR in Shingle Springs, California, within the Eastern District of California.  LE CLAIR was retired from the tech industry and was a well- known dog agility trainer.  LE CLAIR's property had a dog agility course on the northern end of the property.

b)      When they arrived, LE CLAIR offered to allow MQ to run one of LE CLAIR's dogs through the course as well.  MQ did so and LE CLAIR told him he had real talent.  LE CLAIR offered to begin to train MQ in dog agility.  MQ took to it quickly and enjoyed the training.  While his sister ceased training with LE CLAIR in a few months, MQ continued training.

c)      Eventually, MQ began to compete at dog agility meets with LE CLAIR.  For some of these meets, he would stay the night prior to the event at LE CLAIR's home and then travel to the meets with LE CLAIR the following morning.

d)      After three years, LE CLAIR told MQ about an international dog agility

competition taking place in July 2017 in Luxembourg.  LE CLAIR believed MQ was skilled enough to compete in this international meet.  MQ's parents were unable to pay for the trip, but LE CLAIR offered to pay the lion's share of the costs of the trip, and to pay for MQ's older brother, referred to herein as "CQ," to accompany them.  CQ was 17 years of age at the time, but turned 18 during the trip to Europe.

e)      LE CLAIR, MQ, and CQ left for Europe in early July 2017.  MQ provided photos of his passport reflecting an entry stamp at Paris' Charles De Gaulle airport on July 6, 2017.  The trip lasted approximately two weeks and the trio toured through various European countries until they arrived in Luxembourg.

f)      MQ competed in the meet in Luxembourg and then the trio toured back to Paris.  They stayed in a hotel off the Champs Elysees with a view of the Arc de Triomphe.  They were scheduled to leave on July 21, 2017.

g)      On July 19, 2017, MQ and CQ decided they wanted to get drunk.  In Europe, the legal drinking age is younger and they reasoned this may be their only chance before returning to the United States.  LE CLAIR overheard their conversation and told them he would accompany them and pay for the drinks, but remain sober himself and ensure they returned to the hotel safely.

h)      That night, they went drinking.  MQ believed they went to an Irish pub, but was unsure.  MQ recalled that LE CLAIR bought him and CQ drinks with a lot of alcohol in them.  He believed his drink contained over 10 shots of alcohol and his recollection is that he finished his own drink, and finished the portion of CQ's that CQ could not finish.  MQ almost immediately felt drunk.

i)      MQ did not recall much of the rest of that night clearly.  He vaguely recalled walking back to the hotel with CQ and LE CLAIR.  He did clearly recall that he was sick when they returned to the hotel and he vomited on himself and the hotel room.  He believed LE CLAIR called hotel staff to come clean up the room.

j)      MQ decided to take a shower to clean himself up.  He went into the bathroom, took off his clothes, and the last thing he recalled was lying in the bathtub with the shower

running on him.  He believes he passed out lying in the shower.

k)   The next morning, MQ awoke to find himself nude lying in bed.  He did not sleep in the nude, normally, and especially not when he was sharing a hotel room with other people.  However, his last recollection from the night before was lying naked in the bathtub, so he was not completely surprised to find he was not wearing clothes.  He put on his underwear and walked into the bathroom.  LE CLAIR was awake, sitting on his bed with his iPad.

l)   Later that morning, MQ, CQ, and LE CLAIR went to breakfast.  MQ recalled LE CLAIR being inappropriate during this meal.  He specifically recalled LE CLAIR discussing masturbation and asking the boys if they ever inserted their finger into their rectum while masturbating.  This made MQ very uncomfortable.  LE CLAIR had joked about sexual topics before this, but not as explicitly as this.

m)   When they returned to the hotel after breakfast, CQ and LE CLAIR decided to go sightseeing on their last day.  MQ, however, wished to stay behind in the room.  After LE CLAIR and CQ left, MQ decided to talk with friends via Snapchat, a social media app that allows users to communicate by text or video call from anywhere in the world.  However, MQ had vomited on his cell phone, rendering it inoperable, so he used LE CLAIR's iPad instead.

n)   MQ had used LE CLAIR's iPad prior, with LE CLAIR's permission, to watch movies.  He downloaded the Snapchat app to the iPad and logged in to his account.  He began a conversation with a friend with the initials H.M.  Part way through this conversation, MQ accidentally pressed the icon in the Snapchat application that is designed to allow the user to send a photo or video from the device's photo application to another Snapchat user.  When he did this, a window opened showing photos and videos on the device.  The screen was filled with photos of MQ's nude body and genitalia.

o)   MQ was shocked.  He told H.M. what was happening, but did not recall that portion of the conversation well.  He hung up with H.M. and tried to figure out what to do.  He recalled there being a whole screen full of photos of him, estimating he saw over 20.  Some of these photos depicted a close up of his genitalia.  In some of the photos, LE CLAIR's hand could be seen touching his penis.  He knew it was LE CLAIR's hand because he recognized it, and in

some of these photos, he could see his brother in the background of the photo asleep.  In addition, the device belonged to LE CLAIR.

p)      In addition, he observed a video of himself walking around the hotel room in his underwear.  It appeared it had been captured that morning when he had walked into the bathroom.

q)      MQ was in shock.  He sent a message to CQ on Snapchat telling him what he had found.  CQ was skeptical, but believed MQ after MQ sent a few of the photos to CQ to prove his statement.  CQ told him to stay at the hotel and he would come up with a reason to return to the hotel.

r)      When LE CLAIR and CQ arrived, CQ came up with a reason for CQ and MQ to go downstairs without LE CLAIR, and they called their parents.  Many attempts to reach their mother and father were unsuccessful, but they eventually were able to reach their father, referred to herein as "SQ".

s)      SQ told MQ he needed to just keep it together and act like nothing happened until they could get home from Europe.  SQ said he would normally get the next flight to Paris to help MQ and CQ, but he likely couldn't get to Paris before they were scheduled to depart the next morning.

t)      MQ and CQ did so.  MQ was very uncomfortable around LE CLAIR and he believed LE CLAIR realized it.  LE CLAIR seemed upset and scolded MQ about his attitude and mentioned all that LE CLAIR had done for him.

u)      The next day, the three departed Paris, France to return home.  When they boarded the airplane, MQ tried to sit by himself.  They had three seats, two near the window, then one across the aisle from these two.  When MQ tried to sit in the one across the aisle, LE CLAIR refused to let him, saying he wanted to sit next to MQ and talk to him on the flight.

v)      MQ said LE CLAIR talked to him on the flight back about how ungrateful MQ was for this trip and pointed out that LE CLAIR could have been doing other things with the time he had spent with MQ.

w)      When they landed at the airport in San Francisco, California, MQ's mother picked

them up.  They drove to LE CLAIR's house to drop him off, then drove home.  The trip from San Francisco to LE CLAIR's house was very difficult for MQ.  His mother was being nice to LE CLAIR and MQ knew the whole time what LE CLAIR had done to him.

x)     When they returned home, the Q family discussed what happened.  Approximately a week later, MQ's mother (referred to herein as "LQ") and CQ confronted LE CLAIR about what happened.  MQ was not present for this discussion.  *[I interviewed LQ  and CQ and their discussion with LE CLAIR is related later in this affidavit.]*

y)     MQ did not know then how this would affect him, but in the following months he began to have difficulties in school.  He began experimenting with alcohol and drugs and his grades suffered.  He also struggled with self-harm.

z)     MQ had not spoken to LE CLAIR since they returned from Paris, France.

aa)    During the interview, MQ positively identified the California Driver's License picture of TERRY LE CLAIR as the man he was referring to as LE CLAIR throughout this interview.  He was shown the picture, but not the name associated with the picture.

13.    MQ later emailed me a picture of his passport, confirming the dates of entry to and exit from Paris, France as July 6 and 21, 2017, respectively.  MQ also emailed me a series of photos depicting himself, CQ, and LE CLAIR in Europe, including one depicting LE CLAIR and MQ in front of the Eiffel Tower in Paris, France.

***INTERVIEW OF CQ***

14.    I interviewed CQ in early July 2022.  CQ told me the following, in part:

a)     CQ confirmed the details of the trip to Europe described to me by MQ.  CQ confirmed he had received the message from MQ while CQ was sightseeing with LE CLAIR and confirmed that MQ had sent him a few of the pictures MQ had found on LE CLAIR's iPad when CQ was skeptical of MQ's story.

b)     CQ confirmed that the photos he had seen depicted MQ's genitals.  However, he could not describe the photos in more detail because he did not look at them closely.  Once he saw that they depicted his brother's penis, he looked away and began thinking about what to do

about the situation.

    c)    CQ recalled boarding the plane to return from Paris and trying to sit next to LE CLAIR in the seats near the window to shield MQ from having to sit next to LE CLAIR. However, LE CLAIR insisted on sitting next to MQ.

    d)    CQ recalled talking to LE CLAIR with his mother and confronting him about taking the photos.  CQ's memory of this conversation is that LE CLAIR did not admit to taking the photos.  CQ pointed out to LE CLAIR that CQ had seen some of the photos.  At that point, LE CLAIR's face became "beet red."  CQ said it seemed like LE CLAIR did not know what to say.

***INTERVIEW OF LQ***

15.    I interviewed LQ in July 2022 and she told me the following, in part:

    a)    LQ confirmed MQ's story of how he and the Q family first became involved with LE CLAIR.  LQ did not recall any "grooming" on the part of LE CLAIR.  LQ advised that the Q family never paid LE CLAIR for any of the training that MQ received.

    b)    LQ recalled that when the Luxembourg trip was first suggested, she had refused because the Qs could not afford such a trip at that time.  LE CLAIR had offered to pay most of the costs.  LQ again refused, as she was unable to take time off of her work to accompany MQ and LE CLAIR.  LE CLAIR suggested CQ accompany them.

    c)    LQ recalled talking with mothers of other children LE CLAIR was working with about the competition in Europe.  These other mothers had daughters working with LE CLAIR and their daughters had gone to compete in Luxembourg with LE CLAIR in prior years.  She recalled they encouraged her to allow MQ to go as it would be a great experience.  The accounts of these mothers helped LQ trust that MQ would be safe if she allowed him to travel to Europe with LE CLAIR.

    d)    After she had assented to the trip, LE CLAIR had come to the Q family home with a full itinerary, indicating where he and the Q boys would stay, what they would see in each city, and additional details.

e)      LQ recalled hearing about LE CLAIR taking explicit photographs of MQ when her husband called her to tell her he received a phone call from MQ and CQ from Paris.  She was upset when she heard about it.

f)      LQ confirmed she picked up LE CLAIR, MQ, and CQ at the San Francisco airport upon their return from Europe.  She recalled driving to LE CLAIR's house to drop him off, then driving to the Q family home afterward.  She could tell MQ was very upset during the drive from San Francisco.

g)      LQ recalled the confrontation at LE CLAIR's home with CQ about a week after they returned from France.  Her memory was that LE CLAIR acknowledged he took the photos and told her he would delete them.  He was in tears during a portion of this discussion.  She had not seen or had contact with LE CLAIR since that conversation.

16.     LQ later provided the writer with a copies of email communications and attached itinerary documents she had received from LE CLAIR via email, regarding the 2017 trip to the Luxembourg competition.  They were sent from the SUBJECT ACCOUNT and the earliest email was dated March 7, 2016.

***INTERVIEW OF TERRY LE CLAIR***

15.     On September 22, 2022, a Federal search warrant was executed at the residence of TERRY LE CLAIR.  LE CLAIR provided a voluntary, Mirandized statement, related below, in part:

a.  LE CLAIR provided the SUBJECT ACCOUNT as his only email address.

b.  LE CLAIR admitted he trained MQ in dog agility training and that he had traveled to Europe with MQ and CQ to allow MQ to compete in a dog agility competition in Luxembourg.

c. LE CLAIR said he had hit his head while in Luxembourg, exacerbating a previous condition he called "brain shearing." He said the effect of this was it made him dizzy and "loopy" and caused him to have bad judgement during these spells.[1]

d. LE CLAIR admitted he went to a bar in Paris, France where the two boys got drunk, though he said CQ had purchased the drinks consumed by MQ and CQ. LE CLAIR brought them back to the hotel they were staying at near the Arc de Triomphe. LE CLAIR recalled MQ vomiting all over the hotel room and that LE CLAIR had to clean up some of the vomit.

e. LE CLAIR said that the act of cleaning vomit off of the carpet caused him to crouch down to ground level and then stand up several times and that this motion exacerbated his mental condition and caused him to be loopy.

f. LE CLAIR recalled that MQ passed out and CQ took off all of MQ's clothes and laid MQ in LE CLAIR's bed before he also passed out. CQ warned LE CLAIR to watch MQ and make sure he did not choke on any vomit while he was asleep. LE CLAIR was very worried about MQ.

g. LE CLAIR admitted he took a few pictures of MQ while he was asleep and naked. LE CLAIR claimed he only took two or three photos and that MQ's genitals were visible, but may have been blurry in those photos.

h. LE CLAIR did not have an explanation as to why he had taken these photos.

i. LE CLAIR also said he did not touch MQ, except to clean vomit off of his body with a washcloth.

---

[1]    I received LE CLAIR's Kaiser medical records, which confirmed he went to Kaiser Roseville hospital shortly after returning from Europe in 2017. While I am not a medical expert, these records indicate his CT head scan was "unremarkable." He was discharged after several hours with instructions to ice the sore area as directed, return if he experienced serious conditions, and follow up with primary care physician in 2-3 weeks, or sooner if not improved.

j.   LE CLAIR recalled when LQ and CQ confronted him about taking the photos after they had returned from Europe.  LE CLAIR said he had admitted to taking the photos and had apologized to LQ and promised her he would delete the photos.  LE CLAIR admitted he had transported the photos back to the United States on his tablet, and had attempted to delete them after the conversation with LQ and CQ.  However, LE CLAIR was unsure if the photos had possibly been backed up to either his Google cloud storage, or the SUBJECT ACCOUNT (LE CLAIR provided the email account he used for his Microsoft account during the interview).

k.   LE CLAIR said he used both his Google Drive cloud storage and his Microsoft OneDrive account (the SUBJECT ACCOUNT) to back up his files.  LE CLAIR said his intent was to fully delete the files, but he was unsure if he had been successful.

16. During a break in the interview, investigators located two hidden camera devices in LE CLAIR's bedroom, as well as digital video footage that appeared to have been captured by these devices. This footage depicted various boys and men showering, changing clothes, and otherwise naked, mostly in the master bathroom of LE CLAIR's residence.  Most of the video files began depicting LE CLAIR placing the camera device in place and ended with LE CLAIR retrieving the device after the subject of the video had finished changing or showering.  At least four of these videos depicted MQ, and at least one depicted CQ, both before they were 18 years of age. LE CLAIR made the following statement about these videos, in part:

a.   LE CLAIR admitted he had been planting hidden camera devices and capturing young boys and men naked for over a decade.  He stated he would save these files to one of his computer devices and generally would insert the name or initials of the subject of the video into the filename to keep track of who was in the video.

i.  Note: The files located that depicted MQ had "[MQ's first name] Q" in the filename, and the video that depicted CQ had "[CQ's first name] Q" in the filename.  Other files that depicted hidden video of naked boys similarly contained first names or initials in the filenames.

b.  When asked why LE CLAIR had captured these videos, he replied they were "prurient." He later said that some things have no reason behind them.  He also stated he was a pornography collector and these were for his pornography collection.  He denied having sent them to anyone else or posting them to the internet.

17.    While LE CLAIR did not know specifically which files would be found in his OneDrive account, he said he regularly used the SUBJECT ACCOUNT to back up files and store files.  He did not seem to pay close attention to which files were copied to his online storage accounts, including the SUBJECT ACCOUNT.  I suggest there is probable cause to believe that copies of the explicit photos LE CLAIR took of MQ while in Paris, France, as well as copies of the surreptitious explicit videos LE CLAIR captured with his hidden camera devices may be found in the SUBJECT ACCOUNT.

18.    LE CLAIR was arrested based on probable cause to believe he had committed a violation of 18 U.S.C. § 2251(c), and a grand jury subsequently returned an indictment, charging LE CLAIR with that violation in case 2:22-CR-0197-JAM.  Investigation continues into other crimes LE CLAIR may have committed, including sexual exploitation of children in his residence, in violation of 18 U.S.C. § 2251(a) and / or (e).

19.    The writer served a preservation request letter on Microsoft on September 23, 2022 requesting the contents of the SUBJECT ACCOUNT be preserved pending this search warrant.  It should be noted that Microsoft sent an email message to the writer on October 20, 2022 indicating the corporation had just processed the preservation request that day and had preserved the contents of the account as of October 20, 2022, almost a full month after the request had been served using the

Microsoft online law enforcement portal.  LE CLAIR was ordered released once he posted a $500,000 property bond (he was arrested near the conclusion of the search warrant on September 22, 2022) and satisfied other conditions of release, such as turning in his passport to Pretrial Services and turning in his assault rifle and ammunition to local law enforcement.  LE CLAIR posted that property bond on or about October 11, 2022, the date that Magistrate Barnes signed an Order for Release from Custody for LE CLAIR.  In response to my message questioning this delay in time attributable to Microsoft, someone at "Microsoft Domestic Compliance" wrote to me on October 21, 2022, "Please be aware that preservation requests are handled on a first in/first out basis. Additionally, the confirmation e-mail is sent when the request is finalized and closed out in our system, and does not necessarily relate to when data was pulled for the request."  Also on October 21, 2022, the prosecutor, who was involved in this email exchange, asked for the date the account was actually preserved.  On the afternoon of October 25, 2022, the prosecutor and I spoke with the supervisor of Microsoft's domestic compliance team.  She suggested that we re-submit the preservation request today (because the original request letter had a slight typographical error in the email account associated with LE CLAIR's Microsoft account, and thus no data had been preserved).  I have now re-submitted the updated preservation request.  Microsoft indicated that they have received this updated preservation request.  Thus, there is a possibility that LE CLAIR or someone acting on his behalf (since he has been ordered not to access the internet, although I am familiar with cases where defendants involved in child exploitation cases have violated that condition of their bond) was able to alter or delete the contents of the SUBJECT ACCOUNT before the account was preserved.

## V.     CHARACTERISTICS COMMON TO INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN OR WHO PRODUCE, RECEIVE AND/OR POSSESS CHILD PORNOGRAPHY, OR TRAVEL INTERNATIONALLY TO ENGAGE IN ILLICIT SEXUAL CONDUCT WITH MINORS

20.     Based on my previous investigative experience related to child exploitation

investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with minors:

a)      Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with minors may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b)      Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with minors may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c)      Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with minors almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d)      Likewise, individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with minors often maintain their child pornography images in a digital or electronic format in a

1   safe, secure and private environment, such as an electronic account, on a computer and surrounding

2   area.  These child pornography images are often maintained for several years and are kept close by,

3   usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to

4   enable the individual to view the child pornography images, which are valued highly.

5           e)      Individuals who have a sexual interest in children and/or produce, receive, or

6   possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with

7   minors also may correspond with and/or meet others to share information and materials, rarely destroy

8   correspondence from other child pornography distributors/possessors, conceal such correspondence as

9   they do their sexually explicit material, and often maintain lists of names, addresses, and telephone

10  numbers of individuals with whom they have been in contact and who share the same interests in child

11  pornography.

12          f)      Individuals who have a sexual interest in children and/or produce, receive, or

13  possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with

14  minors often utilize multiple accounts to converse with potential victims.  This is often a tool to either

15  keep track of victims, represent oneself as more than one person, or a safety net in case one of the

16  accounts is shut down by the service provider.  Illicit accounts are often established with little or no

17  subscriber information, and when subscriber information is provided, it is often incomplete and/or

18  fictitious.

19                          **IX. CONCLUSION**

20          21.     Based on the foregoing, there is probable cause to believe that the federal criminal

21  statute(s) cited herein have been violated, and that the contraband, property, evidence, fruits and

22  instrumentalities of these offenses, more fully described in Attachment B of this affidavit, are located in

23  the SUBJECT ACCOUNT, described in Attachment A.  I respectfully request that this Court issue a

24  search warrant for the SUBJECT ACCOUNT, authorizing the seizure and search of the items described

25  in Attachment B.

26          22.     Because the warrant will be served on MICROSOFT CORPORATION, who will then

27  compile the requested records at a time convenient to it, I further request execution of the requested

28  warrant be permitted at any time in the day or night.

23.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

/s/ Scott Schofield

Scott A. H. Schofield
Special Agent
Federal Bureau of Investigation

Subscribed to me over the telephone and signed by me pursuant to Fed. R. Crim. P. 41(d)(3):

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

/s/ Christina McCall
Approved as to form by AUSA CHRISTINA McCALL

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the MICROSOFT account:

- TLECLAIR101@GMAIL.COM

that is stored at premises controlled by MICROSOFT CORPORATION, a company that

accepts legal process via a law enforcement portal I have used and am familiar with.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be disclosed by** MICROSOFT CORPORATION **(the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, posts, messages, logs, chats, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A for the time period of **January 1, 2017 to the PRESENT**:

a.      The entire contents of the MICROSOFT account (including OneDrive contents and files and any associated Hotmail account contents) and any information or data associated with the accounts, including stored or preserved copies of posts, photos, videos, messages, chats, and emails sent to and from the accounts, draft messages and emails, the source and destination accounts associated with each message and email, the date and time at which each message or email was sent, and all contents of these messages and emails;

b.      All records or other information regarding the user(s) of the accounts, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, email and alternative email addresses provided during registration, methods of connecting, log files, and any means and source of payment (including any credit or bank account number(s) in full) if provided;

AFFIDAVIT

c.      The types of services utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and "friend" lists, calendar data, pictures, videos, and files.  This includes, but is not limited to, the entire contents of the OneDrive portion of the account.

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

f.      Any and all location data, GPS or otherwise, associated with the account or any of the account contents.

g.      Any information in Microsoft Corporation USA's possession regarding any deletions or alterations of data in the SUBJECT ACCOUNT on or after September 22, 2022.

**\*\*The Provider is hereby ordered to disclose the information to the government within 14 days of the issuance of this warrant.\*\***

II.      **Information to be seized by the government**

All information described above in Section I that constitutes evidence, instrumentalities, contraband, or fruits of violations of 18 U.S.C. §§ 2251, Sexual Exploitation of Children; and Title 18 U.S.C. §2423(c), Engaging in Illicit Sexual Conduct in a foreign place, including, for each account or identifier listed on Attachment A, information pertaining to the following:

(a) Sexually explicit communication with, and receipt or distribution of sexually explicit images/videos from, minors;

(b) Possession of sexually explicit images/videos of minors;

(c) Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and

AFFIDAVIT

events relating to the crimes under investigation and to the MICROSOFT account owner(s);

(d) Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

(e) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

(f) Information indicating a link between the account(s) and any other online accounts, i.e. Snapchat, Google, Expedia, or other account(s);

(g) The identity of the person(s) who communicated with the user(s) of any of the accounts about matters relating to the production and/or receipt and/or distribution and/or possession of child pornography, and/or engaging in sexually illicit conduct in a foreign place, including records that help reveal their whereabouts;

(h) Any location or other data indicative of travel between California and Paris, France;

(i) Any records regarding the purchase of, or use of, any hidden camera devices, such as a camera hidden in a pen or a car key fob;

(j) Any and all communications with MQ, CQ, or any other identified persons appearing in hidden camera footage recovered in the investigation, regardless of the type of communication (i.e. email or chat message or audio call, etc.).

(k) Any information regarding any deletions or alterations of data in the SUBJECT ACCOUNT on or after September 22, 2022.

This warrant authorizes a review of electronically stored information, communications, other

AFFIDAVIT

records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to federal and local law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AFFIDAVIT

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| INFORMATION ASSOCIATED WITH TLECLAIR101@GMAIL.COM THAT IS STORED AT PREMISES CONTROLLED BY MICROSOFT CORPORATION ) ) ) ) ) | Case No.   2:22-sw-0770 EFB |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the       Western       District of       Washington
*(identify the person or describe the property to be searched and give its location)*:

## SEE ATTACHMENT A, attached hereto and incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

## SEE ATTACHMENT B, attached hereto and incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before       November 8, 2022       *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     10/25/22 at 4:56 p.m.

City and state:     Sacramento, California

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                                    Date

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the MICROSOFT account:

- TLECLAIR101@GMAIL.COM

that is stored at premises controlled by MICROSOFT CORPORATION, a company that accepts legal process via a law enforcement portal I have used and am familiar with.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.       Information to be disclosed by** MICROSOFT CORPORATION  **(the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, posts, messages, logs, chats, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A for the time period of **January 1, 2017 to the PRESENT**:

a.       The entire contents of the MICROSOFT account (including OneDrive contents and files and any associated Hotmail account contents) and any information or data associated with the accounts, including stored or preserved copies of posts, photos, videos, messages, chats, and emails sent to and from the accounts, draft messages and emails, the source and destination accounts associated with each message and email, the date and time at which each message or email was sent, and all contents of these messages and emails;

b.       All records or other information regarding the user(s) of the accounts, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, email and alternative email addresses provided during registration, methods of connecting, log files, and any means and source of payment (including any credit or bank account number(s) in full) if provided;

c.      The types of services utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and "friend" lists, calendar data, pictures, videos, and files.  This includes, but is not limited to, the entire contents of the OneDrive portion of the account.

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

f.      Any and all location data, GPS or otherwise, associated with the account or any of the account contents.

g.      Any information in Microsoft Corporation USA's possession regarding any deletions or alterations of data in the SUBJECT ACCOUNT on or after September 22, 2022.

**\*\*The Provider is hereby ordered to disclose the information to the government within 14 days of the issuance of this warrant.\*\***

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence, instrumentalities, contraband, or fruits of violations of 18 U.S.C. §§ 2251, Sexual Exploitation of Children; and Title 18 U.S.C. §2423(c), Engaging in Illicit Sexual Conduct in a foreign place, including, for each account or identifier listed on Attachment A, information pertaining to the following:

(a) Sexually explicit communication with, and receipt or distribution of sexually explicit images/videos from, minors;

(b) Possession of sexually explicit images/videos of minors;

(c) Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and

events relating to the crimes under investigation and to the MICROSOFT account owner(s);

(d) Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

(e) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

(f) Information indicating a link between the account(s) and any other online accounts, i.e. Snapchat, Google, Expedia, or other account(s);

(g) The identity of the person(s) who communicated with the user(s) of any of the accounts about matters relating to the production and/or receipt and/or distribution and/or possession of child pornography, and/or engaging in sexually illicit conduct in a foreign place, including records that help reveal their whereabouts;

(h) Any location or other data indicative of travel between California and Paris, France;

(i) Any records regarding the purchase of, or use of, any hidden camera devices, such as a camera hidden in a pen or a car key fob;

(j) Any and all communications with MQ, CQ, or any other identified persons appearing in hidden camera footage recovered in the investigation, regardless of the type of communication (i.e. email or chat message or audio call, etc.).

(k) Any information regarding any deletions or alterations of data in the SUBJECT ACCOUNT on or after September 22, 2022.

This warrant authorizes a review of electronically stored information, communications, other

records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to federal and local law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS
## PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the

United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this

certification is true and correct.  I am employed by _____, and my title is

_____.  I am qualified to authenticate the records attached hereto because

I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records

attached hereto are true duplicates of the original records in the custody of _____.  The

attached records consist of _____.  I further state that:

      a.    all records attached to this certificate were made at or near the time of the occurrence of

the matter set forth by, or from information transmitted by, a person with knowledge of those matters,

they were kept in the ordinary course of the regularly conducted business activity of _____,

and they were made by _____ as a regular practice; and

      b.    such records were generated by _____ electronic process or system that

produces an accurate result, to wit:

          1.    the records were copied from electronic device(s), storage medium(s), or file(s) in

the custody of _____ in a manner to ensure that they are true duplicates of the original records; and

          2.    the process or system is regularly verified by _____, and at all times

pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the

Federal Rules of Evidence.


_____   _____

Date                     Signature